**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ANTHONY T. ARMIJO,

        Applicant,

v.                                                      CV 07-1066 JH/WPL

GEORGE TAPIA, WARDEN, AND
THE ATTORNEY GENERAL OF
THE STATE OF NEW MEXICO,

        Respondents.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

        Anthony T. Armijo abducted his girlfriend, Heather Atencio, from a neighbor's apartment, took her to his apartment, and barricaded the door. (Doc. 16 Ex. II at 2, Ex. JJ at 2.) When SWAT officers broke in they found Armijo, Atencio, and a bloody knife on or near the bed. Atencio's nightgown was pulled up and she had numerous stab wounds. (Doc. 16 Ex. II at 2.) Armijo was convicted of several charges arising from this incident, including kidnaping, attempted criminal sexual penetration, and aggravated battery. He was sentenced to fifteen years in prison. (*Id.* Ex. A.)

        Armijo has filed an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody, raising only one issue: that his right to due process was violated by the prosecution's failure to conduct DNA testing on the blood on the knife. (Doc. 1 at 9.) The matter is before me now on the application (Doc. 1), two motions for summary judgment filed by Armijo (Doc. 3, 10), and a motion to dismiss filed by Respondents (Doc. 17). Concluding that Armijo's sole issue lacks merit, I recommend that habeas relief be denied and the matter be dismissed.

## PROCEDURAL BACKGROUND

The trial court appointed a series of five attorneys for Armijo. (Doc. 16 Ex. LL at 2.) Armijo had conflicts with each of the attorneys. (*Id.* Ex. II at 3-7, Ex. JJ at 7-12.) In January 2003, the trial court granted a motion to withdraw filed by Armijo's third attorney, allowed Armijo to represent himself, and appointed a fourth attorney to act as standby counsel. (*Id.* Ex. II at 3-4, Ex. JJ at 7-9.) In March, Armijo's standby counsel filed a Motion for Specific Discovery. (Doc. 10 Attachment.) Armijo requested discovery of several items, including supplemental reports by law enforcement officers and "[r]esults of any testing done on the alleged knife, specifically any tests done on the blood." (*Id.*)

On March 24, 2003, a hearing was held on the Motion for Specific Discovery. Most of the hearing was consumed with issues regarding the supplemental reports. (*See* 3/24/03 Tr. at 4, 10-15, 20-28.) Turning to Armijo's discovery request regarding the knife, the judge asked the prosecutor whether any testing had been done on the knife. The prosecutor replied that no testing had yet been done, that the criminal lab would need "what are called standards for which to test the blood against," and that if Armijo would be willing to provide a blood sample, he would "have standards matched against that." (*Id.* at 16.) Armijo agreed to provide a blood sample, and the prosecutor asked the judge if he could order a time and place to have the blood drawn. (*Id.* at 17.) The judge replied that it should be done "as soon as possible," and Armijo stated, "Any time." (*Id.*) They proceeded to discuss Armijo's other discovery requests and eventually returned to issues regarding the supplemental reports. (*Id.* at 17, 20.) The judge then asked the prosecutor, "[A]s far as the motion for specific discovery, can you provide or check on all these things by Friday of this week?" The prosecutor indicated that he could do that, specifically referencing the supplemental reports. (*Id.* at

2

21.) Another lengthy discussion about the supplemental reports ensued. (*Id.* at 21-28.) The discussion concluded as follows:

> Judge: So we've got Detective Arbogast and Office Rochelle, that's squared away, and Detective Green. So you need to check on Detective Wallace, Detective Curtis, Sergeant Feist.
>
> Armijo: The rest we got.
>
> Judge: Okay. Do that by Monday of next week.
>
> Prosecutor: I should be able to, Your Honor.
>
> Judge: A week from today.
>
> Prosecutor: A week from today.
>
> Armijo: The State did not comply.
>
> Judge: There is going to be drastic results.
>
> Armijo: Okay. Thank you. Also the emergency motion I have here, sir.
>
> Judge: Sanctions can be anywhere from contempt to dismissal.

(*Id.* at 27-28.)

On April 15, 2003, Armijo filed a Motion for Order to Show Cause, requesting that the prosecutor be held in contempt or that the charges be dismissed because the prosecutor had failed to provide the discovery the judge had ordered to be produced at the March 24th hearing. (Doc. 10 Attachment.) Armijo stated that the court "ordered [the] District Attorney to take blood from Defendant to compare with blood evidence found in Defendant[']s bedroom." (*Id.*)

On April 21, 2003, a hearing was conducted on the Motion for Order to Show Cause. Armijo was assisted at this hearing by a new standby attorney because the court had allowed the previous

3

standby attorney to withdraw. (Doc. 16 Ex. II at 6-7, Ex. JJ at 9-10.)[1] The prosecutor stated that he had intended to take a blood sample from Armijo when Armijo conducted witness interviews in the judge's jury room. The interviews were delayed because of three jury trials. (4/21/03 Tr. Vol. I at 5.) One of the interviews had been scheduled for that afternoon. The prosecutor had determined that only a "mouth swab," and not a blood sample was needed. (*Id.*) He anticipated that the mouth swab could be taken during the interview that afternoon. (*Id.*)

In the course of the April 21st hearing, the judge sternly admonished Armijo of the pitfalls of self-representation. (*Id.* at 31-37.) After a recess, Armijo announced that he had changed his mind about representing himself. (4/21/03 Tr. Vol. II at 2.) The judge appointed the standby attorney to represent Armijo. (*Id.* at 5.) The prosecutor indicated that he had just learned that the officer who would perform the mouth swab would not be available that afternoon, so they would "find another time in which to do the swab." (*Id.* at 8.)

Within a month of the April 21st hearing, Armijo's newly appointed attorney asked to withdraw because Armijo had filed a disciplinary complaint against him. (Doc. 16 Ex. II at 7.) At a hearing in October 2003, counsel renewed the request to withdraw and Armijo told the court that he would not cooperate with counsel. (*Id.*) On April 2, 2004, counsel renewed the motion again, noting that Armijo would not cooperate with him. The court refused to allow counsel to withdraw. (*Id.* at 8.)

---

[1] The State's brief in Armijo's direct appeal quoted the previous standby counsel as stating in open court that "'whether or not [Defendant] ever intended by his words or actions, I have become physically uncomfortable around [Defendant] and this is beyond the scope of the requirements of my contract.'" (Doc. 16 Ex. JJ at 9.)

4

Trial commenced on April 12, 2004. Before voir dire, defense counsel made the following argument:

> The issue that needs to be brought up on the record, what we discussed in chambers, after discussing the case with Mr. Armijo this morning, he has indicated — I shouldn't say "indicated," but it seems to me to be necessary, in order to put on — for him to receive a fair trial and put on his defense, that he receive, prior to trial, the results from the blood analysis that needs to be done by the State's lab. And that, if it comes back the way that we are anticipating it will, it will greatly enhance his ability to properly present a defense and help to corroborate his testimony, should he testify at trial, and I believe that that's — the blood issue, regarding whose blood it is, goes to the heart of the entire case; not just to be heart of the battery.
> It goes to the heart of whether or not Ms. Atencio is making up the entire scheme by which she got down to the apartment and whether or not she is making up the series of events that I believe she is going to testify to, based on my interview with her, at trial, that happened inside the apartment. So we, again, are asking that we receive sufficient time to get those — the blood analysis done. [The prosecutor] indicated that the lab would say — has told them that it would take a while to get it done. We're waiting to hear back from them, this morning, exactly the amount of time, given the pressure of going to trial. So we are going to ask the Court to reset the case to allow that to happen.

(4/12/04 Tr. at 12-13.)

The prosecutor indicated that she was not sure whether evidence regarding the blood had been submitted to the lab for testing, but that all of the evidence that had been submitted to the lab had been "mothballed" because the case had been pending so long without a trial setting. (*Id.* at 13-14.)[2] She asserted that Armjio had had plenty of time to demand the blood analysis and argued that the request for the blood analysis was a delaying tactic. (*Id.* at 15.) Defense counsel reminded the court that Armijo requested the blood analysis "quite some time ago" when he was *pro se*: "As the Court's aware — I mean, in terms of my understanding of his position concerning the factual portions of the case — I'm pretty recent to that knowledge, but he still did make a request for that analysis

---

[2] This was not the same prosecutor who appeared at the 2003 hearings described above.

5

before then, so I don't believe it's fair for the State to characterize it as some last-minute delay tactic." (*Id.*)  The court refused to grant a continuance. (*Id.* at 17-20.)

At the beginning of the second day of trial, the prosecutor announced that the lab could not guarantee that the blood analysis could be completed within six weeks. (Doc. 10 Attachment.)  That day and the next, defense counsel again moved to withdraw. (Doc. 16 Ex. II at 8-9.)  He stated that Armijo did not tell him about his defense theory until the first day of trial. (*Id.* at 9.)  The theory was that the blood on the knife was Armijo's own blood, rather than Atencio's. (*Id.* Ex. JJ at 13.)  On April 14th, the court allowed counsel to withdraw, and Armijo proceeded *pro se* for the remainder of the trial. (*Id.* Ex. LL at 3.)

During closing argument, the prosecutor stated:

Common sense, ladies and gentlemen; whose blood was it?  Who was stabbed three times?  Heather Atencio.  One person's blood: Heather Atencio.  You know, that the State didn't have the blood analyzed ought not to enter into your deliberations.  The defense could have easily had the blood analyzed, just the same as the State.  You heard Detective Arbogast: If the defendant or defense wants to have it analyzed, go through crime lab procedures, and it's done.

(Doc. 10 Attachment.)

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), this Court may not grant a writ of habeas corpus on an issue decided on the merits by a state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).  For purposes of 28 U.S.C. § 2254, "clearly established Federal law" includes only Supreme Court precedent interpreting the Constitution.  *Smith v. Dinwiddie*, 510 F.3d

1180, 1186 (10th Cir. 2007). The writ may also issue if the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

To show that a decision is "contrary to" clearly established federal law, an applicant must demonstrate that the state court applied a rule that contradicts the governing law set forth in Supreme Court cases or that it arrived at a different result than the Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1819 (2007).

To show that a decision involved an unreasonable application of clearly established federal law, an applicant must show that "most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law. It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision." *Maynard*, 468 F.3d at 671. Instead, "the state court decision must be 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.'" *Id.* (quoting *Badelle v. Correll*, 452 F.3d 648, 655 (7th Cir. 2006)). In other words, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.*

## DISCUSSION

Armijo contends that the prosecution was obliged to conduct a DNA analysis of the blood on the knife pursuant to *Brady v. Maryland*, 373 U.S. 87 (1963), and its progeny. On direct appeal, his appointed counsel cited *Brady* and argued that the trial court should have required the prosecution to conduct the DNA analysis or else should have held the prosecution in contempt and dismissed the charges. (Doc. 16 Ex. II at 23-26.) The New Mexico Court of Appeals defined the issue as "whether the State had an obligation to perform DNA testing." (*Id.* Ex. LL at 9.) Citing *State v. Rose*, 442

7

P.2d 589, 590-91 (1968), the appellate court observed that "law enforcement's negligent failure to investigate and to make certain tests does not require reversal." (*Id.*) The appellate court held that the trial court did not abuse its discretion in failing to order the State to conduct a DNA analysis on the blood. (*Id.*)[3]

Although the New Mexico Court of Appeals did not cite federal law, its conclusion that the prosecution had no obligation to conduct a DNA analysis is consistent with federal law. The Supreme Court has stated that "the police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988); *see also Riggs v. Williams*, 87 F. App'x 103, 106 (10th Cir. 2004) ("[P]etitioner has offered no legal authority to support his claim that the police had a duty to test the shoes [for blood], and *Youngblood* supports the opposite conclusion."); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) ("*Brady* . . . does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case."); *United States v. Johnson*, No. 07-40012-01-SAC, 2007 WL 1651302, at *7 (D. Kan. June 6, 2007) ("[D]efendant has no constitutional right to have DNA testing done prior to trial."). Thus, the appellate court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law.

In addition to his *Brady* argument, Armijo also claims prosecutorial misconduct. Armijo points out that he requested that the blood on the knife be tested and asserts that the trial judge ordered that it be done. In Armijo's view, the prosecution violated the court's order by failing to

---

[3] This issue is exhausted because it was included in the petition for certiorari filed by appellate counsel and also in Armijo's *pro se* "1st Motion to Amend Writ of Certiorari." (Doc. 16 Ex. MM at 2, Ex. NN at 8-10.) The New Mexico Supreme Court denied certiorari. (*Id.* Ex. OO.)

conduct the analysis and then compounded its misconduct by telling the jury during closing argument that the defense could have had the testing done.[4]

Generally, habeas relief is available for prosecutorial misconduct only if the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Armijo has not shown that prosecutorial misconduct occurred or that the purported misconduct rendered his trial unfair.

It is not clear that the trial judge actually ordered the prosecution to conduct the DNA analysis. At the March 24, 2003 hearing, the prosecutor voiced no objection to conducting the analysis and asked the judge to order a time and place for blood to be drawn, but the judge simply stated that it should be done as soon as possible. Armijo relies on the portion of the transcript in which the judge set a one-week deadline and stated that sanctions could include contempt or dismissal. However, the excerpt of the transcript set forth above indicates that the one-week deadline only applied to the requirement that the prosecutor "check on" certain supplemental reports.

Regardless of whether there was an order, it is clear that the prosecution represented that the DNA analysis would be done, yet failed to follow through with the testing and then argued to the jury

---

[4] Although Armijo's appointed counsel did not make this argument before the appellate court, Armijo arguably raised it in his *pro se* "1st Motion to Amend Writ of Certiorari" and state habeas petition. (Doc. 16 Ex. Y, Ex. NN at 8-10.) He filed the habeas petition with the New Mexico Supreme Court before filing his direct appeal. (*Id.* Ex. Y, Ex. CC.) The supreme court remanded the petition to the trial court. (*Id.* Ex. AA.) The trial court entered an "interim order," declaring that the issues raised in the *pro se* docketing statement and in the habeas petition were "verbatim." (*Id.* Ex. BB.) The court stated, "Since the issues are identical, this court will await the decision by the Court of Appeals. This decision will resolve the issues contained in the Petition for Habeas Corpus . . . ." (*Id.*) No further action has been taken on the state habeas petition. (Doc. 1 at 14-15.) Because I conclude that the prosecutorial misconduct issue is without merit when reviewed under either AEDPA's deferential standard or *de novo*, it is irrelevant whether the issue was exhausted or adjudicated on the merits in state court. *See* 28 U.S.C. § 2254(b)(2); *Johnson v. McKune*, 288 F.3d 1187, 1192 (10th Cir. 2002).

that Armijo could have had the blood analyzed. Nevertheless, it appears that the prosecution's failure to conduct the DNA analysis resulted not from any nefarious intent but from the confusion created by Armijo's switching back and forth from *pro se* status. At the April 21, 2003 hearing, the prosecutor implied that the analysis would be conducted. The judge appointed a final attorney for Armijo at that hearing, who continued to represent him through the beginning of the trial. Counsel apparently did not pursue the DNA analysis because it was not part of his trial strategy. After the April 21, 2003 hearing, the issue did not come up again until the first day of trial nearly a year later, when Armijo advised counsel that his defensive theory relied on a DNA analysis of the blood.

Assuming that the prosecution can properly be charged with misconduct, Armijo has not demonstrated that the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. If the DNA analysis had shown that Armijo's blood was on the knife, that would not necessarily mean that he did not stab Atencio. Atencio testified that Armijo stabbed her, SWAT officers testified that she had stab wounds when they broke into the apartment, photographs of the wounds taken two days later were admitted as evidence, and there is no evidence that anyone else was in the apartment with Atencio and Armijo. (Doc. 16 Ex. II at 2, 30-31.) Even Armijo seems to acknowledge that Atencio suffered some sort of wounds. One of his complaints on appeal was that he was not allowed to call as witnesses the medical personnel who treated Atencio and who would have testified that her "wounds were merely steri-stripped, which proved that there was no great bodily harm." (*Id.* at 29-30.)[5]

---

[5] Appointed counsel's appellate brief states that Armijo contended at trial that Atencio and the SWAT officers "were lying;" that he was not stabbing Atencio when the police burst in, rather she was trying to stab him; and that "the State had failed to prove that he caused any injuries to Ms. Atencio because the injuries could have been caused by the various flares and concussion bombs the SWAT team used to gain entry into his apartment or could have been caused after the incident." (Doc. 16 Ex. II at 2-3.)

10

## RECOMMENDATION

For the reasons stated above, I recommend that:

1) the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Doc. 1) be denied;

2) Armijo's motions for summary judgment (Doc. 3, 10) be denied;

3) Respondents' motion to dismiss (Doc. 17) be granted; and

4) this cause be dismissed with prejudice.

**THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

*William P. Lynch*
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE